# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SCRIPSAMERICA, INC.,[1] | Case No. 16-11991 |
| Debtor. | |

## DECLARATION OF BRIAN ETTINGER IN SUPPORT OF
## CHAPTER 11 PETITION AND INITIAL FILINGS

I, Brian Ettinger, declare:

1.  I am the Chairman of the Board of Directors and Chief Executive Officer of ScripsAmerica, Inc. ("Scrips"), the above-captioned debtor and debtor-in-possession (the "Debtor"). My appointment as Chairman of Scrips' Board of Directors was approved by the Board on May 17, 2011. I later joined Scrips' management team as its interim Chief Executive Officer on June 30, 2015. Scrips' Board of Directors approved my appointment as Chief Executive Officer on November 13, 2015, thereby removing the "interim" label from my position. In this capacity, I am familiar with the Debtor's business, day-to-day operations, and financial affairs.

2.  Since January 1984, I have practiced law in Houston, Texas. In my law practice, I represent international and domestic multi-industry businesses, including oil, natural gas and liquefied natural gas, addressing production and exploration, rig equipment and oil services, contracts, negotiations, collections and business development. I received a Bachelor of Arts degree (Economics, Political Science) from La Salle College in 1974 and a Juris Doctor degree

---

[1] The last four digits of the Debtor's federal tax identification number are 8594. The location of the Debtor's corporate headquarters is 1094 Main Avenue, Suite A, Clifton, NJ 07011.

from South Texas College of Law in 1983.

3.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 (the "Chapter 11 Case") of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended or modified, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"), and filed various motions described herein requesting certain relief (collectively, the "Initial Pleadings"). I submit this declaration (the "Declaration") in support of the Debtor's Chapter 11 Case and the Initial Pleadings.

4.      Except as otherwise indicated herein, all statements set forth in this Declaration are based upon (i) my personal knowledge as a Board member and officer of Scrips, (ii) information supplied to me by other members of Scrips' management or Scrips' professionals, (iii) my review of relevant documents, and/or (iv) my experience with, and knowledge of, the Debtor's financial affairs and operations. If called upon to testify, I would testify to the facts set forth in this Declaration.

5.      This Declaration is divided into the following parts: Part I describes the Debtor's business; Part II describes the circumstances giving rise to the commencement of this Chapter 11 Case; Part III describes the Debtor's planned course for this Chapter 11 Case; and Part IV addresses the Initial Pleadings.

## PART I – THE DEBTOR'S BUSINESS

*Overview of Organizational Chart, Operations*

6.      Scrips was incorporated in the State of Delaware on May 12, 2008 to distribute prescription and over-the-counter pharmaceuticals. Scrips' principal place of business is located at 1094 Main Street, Suite A, Clifton, NJ 07011.

7.      As of the Petition Date, Scrips has two (2) wholly-owned subsidiaries:[2]

- Main Avenue Pharmacy Inc. ("Main Avenue"), a New Jersey corporation formed on January 4, 2011; and

- Pharmacy Administration, Inc. ("Pharmacy Administration"), a Delaware corporation formed on July 21, 2015.

Scrips also own 90% of P.I.M.D. International LLC ("PIMD"), a Florida limited liability company.

*Main Avenue*

8.      In 2014, approximately 97% of Scrips' net revenues were derived from the operations of Main Avenue. Main Avenue discontinued its pharmacy operations on or about August 31, 2016. Prior to that point, Main Avenue was involved in the business of compounding and selling non-sterile topical and transdermal pain creams. Main Avenue focused on the development and sale of prescription pain creams which incorporated up to eight active pharmaceutical ingredients for application on the skin, in localized areas, resulting in minimal systemic absorption and a reduction of possible side effects. Main Avenue's products required a prescription from a physician, were shipped directly to the patient, and were billed through the patient's insurance provider.

9.      Prior to the discontinuance of its pharmacy operations, Main Avenue borrowed against its accounts receivable. The accounts receivable were generated from the filling of

---

[2] DispenseDoc, a Delaware corporation formed on April 10, 2015, was a wholly-owned subsidiary of Scrips at the time of its formation. DispenseDoc was formed to distribute medications directly to physicians allowing them to dispense medication to their patients at their offices and points of care. In order to dispense prescription drugs, physicians must obtain a specific license with the state where their practice is located and contract with pharmacy benefit managers ("PBM"). DispenseDoc planned to assist physicians with these requirements and provide billing software and product formulary. On February 22, 2016, DispenseDoc was sold to Bread and Circuses Media, Inc. for $26,520 plus royalty payments of 1% of the amount of the adjudicated value of the monthly sales made through the DispenseDoc system by each DispenseDoc until March 20, 2017. Prior to the sale, DispenseDoc did not generate material revenue; in essence, DispenseDoc was a startup.

prescriptions, and those receivables were paid for by a health insurance carrier through a pharmacy benefit manager ("PBM").

10.     On March 4, 2015, CVS/Caremark notified Main Avenue that it was terminating the provider agreement with Main Avenue. No basis for the termination was provided. During the three months ended March 31, 2015, CVS/Caremark represented approximately 26% of Scrips' net revenues.

11.     Additionally, a substantial volume of the outstanding accounts receivable was generated by prescriptions filled for insureds whose health insurance carrier is represented by Express Scripts, Inc. ("ESI"), a PBM. On or about April 5, 2016, ESI advised Main Avenue that it had initiated an investigation of a telemarketing doctor who wrote a large number of prescriptions which were filled by Main Avenue. Pending completion of its investigation, and based on ESI's assertion that the doctor did not have an appropriate relationship with the patients, ESI held approximately $3.55 million of Main Avenue's funds and indicated that it might demand reimbursement of prior payments traceable to prescriptions written by the doctor. Main Avenue received prescriptions from the doctor at issue from approximately the fourth quarter of 2014 through approximately the first quarter of 2016.

12.     The actions taken by ESI caused a technical default under the financing documents, of which Main Avenue received notice on April 26, 2016. Main Avenue demanded release of its funds held by ESI, but ESI did not comply prior to the Petition Date. Prior to the Petition Date, ESI conducted four (4) audits of Main Avenue prescriptions, of which three (3) concluded with no chargebacks or reversals against Main Avenue.

13.     Via a written notice sent on or about May 25, 2016, ESI alleged that the doctor did not have the requisite relationship with the patients for whom he wrote the prescriptions and that,

accordingly, the prescriptions were not valid. In the notice, ESI indicated that it would not release any of the $3.55 million being held and, in addition, demanded repayment of $12,155,159.97 almost all of which is due to the claimed "invalid Patient/Prescriber Relationship." Finally, ESI terminated Main Avenue's Network Provider Agreement/Status.

14. During calendar year 2015, Main Avenue generated gross revenue of $38,326,000.00 and net revenue of $27,526,000.00. During the first six (6) months of calendar year 2016, Main Avenue generated gross revenue of $13,361,000.00 and net revenue of $9,761,000.00.

*Pharmacy Administration*

15. Pharmacy Administration provides billing and administrative services to independent pharmacies and holds an interest in a retail pharmacy. During calendar year 2015, Pharmacy Administration generated gross revenue of $0 and net revenue of $0. During the first six (6) months of calendar year 2016, Pharmacy Administration generated gross revenue of $0 and net revenue of $0.

*PIMD*

16. PIMD is a wholesaler to independent pharmacies and other medical providers. In December 2014, Scrips acquired 90% of PIMD's membership units from its sole member, Vanessa Gonzalez. In connection with the transaction, Scrips became the holder of a promissory note owed by PIMD for $272,000, which Scrips contributed to PIMD as the purchase price. In April 2014, PIMD received a license from the Drug Enforcement Agency ("DEA") to receive, store and ship Schedule 3 through Schedule 5 formulary pharmaceuticals. PIMD is currently licensed in 19 states and looks to apply for additional state licenses throughout the United States. During calendar year 2015, PIMD generated gross revenue of $1,955,000.00 and net revenue of $1,945,000.00.

During the first six (6) months of calendar year 2016, PIMD generated gross revenue of $2,375,000.00 and net revenue of $2,365,000.00.

17. Additionally, Scrips directly holds a 14% interest in Wholesale Rx, Inc., a Tennessee corporation.

*Capital Structure*

18. On December 8, 2014, Main Avenue entered into an agreement for a revolving line of credit facility with Triumph Community Bank, N.A. d/b/a Triumph Healthcare Finance ("Triumph"). The agreement was for a term of three years. The facility covers, and is both secured through a lockbox account arrangement and limited by, the accounts receivable of the pharmacy, as well as being secured by a security interest in all of the other assets of Main Avenue. Under its agreement with Triumph, Main Avenue was permitted to draw against the line of credit, up to a maximum of $4,000,000, as accounts receivable are developed from the filling of prescriptions for the specialty drugs and may continue to draw as the then outstanding line is reduced by the payment of the previously financed receivables. The amount drawn could not exceed 85% of the accounts receivable. The interest rate is variable, being calculated as the Base Rate plus the Margin (3%). The Base Rate is the greater of the Prime Rate or the Floor Rate (3.25%). By agreement dated December 8, 2014, Scrips guaranteed Main Avenue's payment and performance obligations to Triumph. As of September 6, 2016, approximately $2,018,727.51 was due and owing from Main Avenue to Triumph under the credit agreement. Scrips' guaranty of Main Avenue's obligations under its credit agreement with Triumph is unsecured.

19. On August 15, 2012, Scrips entered into a four-year term loan agreement in the amount of $500,001 with Development 72, LLC ("Development 72"), a Limited Liability Company, a company controlled by Andrius Pranskevicius, a member of Scrips' board of directors

at the time, for the purpose of funding the inventory purchases of RapiMed®.[3]   This loan bore interest at the rate of 9% per annum, with 48 equal monthly installments of interest and principal payments of $12,443 and matures on August 15, 2016.  This loan was paid off.

20.     Separately, on February 22, 2016, Scrips and Development 72 entered into a stock repurchase/recapitalization plan, pursuant to which Scrips agreed to repurchase Development 72's 2,990,252 shares of Series A preferred stock for the price of $1,439,339.86, with interest accruing at 8% over a two-year term.  Scrips was obligated to pay the debt in twenty-four equal monthly installments of $65,097.44, beginning on February 1, 2016.  Under the repurchase/recapitalization plan, title to the shares passed upon Scrips' payment of the initial monthly installment, which Scrips did (in fact) make.  As of June 30, 2016 approximately $1,367,046.32 was due and owing from Scrips to Development 72 under the February 2016 repurchase/recapitalization plan.

21.     On June 30, 2015, Scrips' then Chief Executive Officer, President and Secretary, Robert Schneiderman, resigned all positions he held with Scrips.  Also on June 30, 2015, Scrips entered into an agreement with Mr. Schneiderman, Scrips' then Chief Executive Officer, President and Secretary that provides for the following terms:

- Scrips agreed to pay to Mr. Schneiderman a severance of $144,000 in semi-monthly installments of $6,000, commencing in July 2015 until paid. In August 2015 these payments were suspended as Mr. Schneiderman breached his agreement.

- Mr. Schneiderman agreed to meet with Scrips' new management, as may be requested, at any mutually convenient time during regular business hours until the close of business on June 30, 2016 and provide such factual background information, documents, files, e-mails, computer files, etc. as may be requested.

- Scrips is obligated to repay two loans to Mr. Schneiderman in the aggregate amount of $212,669 which mature in January 2016, each bearing simple interest at the rate of 12% per annum. Scrips is required to make monthly payments of interest and pay the principal on the maturity date.

---

[3] RapiMed® is a children's pain reliever and fever reducer; Scrips abandoned the launch of RapiMed® in 2016 because of delays in obtaining approvals for distribution in Hong Kong.

7

- Scrips paid Andrea Schneiderman, the spouse of Mr. Schneiderman, for loans made to Wholesale Rx in the amount of $19,214; the sum was paid on July 13, 2015.

- Scrips agreed to pay a credit card balance, issued on the credit of (and in the name of) Mr. Schneiderman, which was been used by Main Avenue and which had an over-limit balance of $59,614. Under the agreement, Scrips was obligated to pay $59,614 of the total outstanding balance. To date, there remains a balance of $30,001.00.

22. In addition to the above-referenced liabilities, Scrips has more than $500,000 of trade debt – primarily owing to law firms – related to various matters, including the litigation matters discussed below. Further, Scrips has certain contingent liabilities related to pending litigation. Finally, Scrips has additional note debt in the amount of $473,602.

## PART II – CIRCUMSTANCES LEADING TO CHAPTER 11 FILING

23. The cessation of Main Avenue's pharmacy operations, described in detail above, adversely affected both Scrips' cash flow and value. Further, Scrips has been involved in significant litigation with Ironridge, described below; the fight has further depleted Scrips' limited resources.

*Ironridge Litigation*

24. In November 2013, Scrips entered into an agreement with Ironridge Global IV, Ltd. ("Ironridge") whereby Scrips issued 8,690,000 shares of common stock to Ironridge in settlement for bona fide claims owed to Scrips' creditors (the "Claim Amount"). The shares issued to Ironridge were unrestricted securities and exempt from registration under Section 3(a)(10) of the Securities Act of 1933, as amended. Under the terms of the transaction, the number of shares issuable to Ironridge was subject to an adjustment based on the trading price of Scrips' common shares such that the value of the shares is sufficient to cover the Claim Amount, a 10% agent fee amount, and Ironridge's reasonable legal fees and expenses, which were determined to be

$766,238.

25. On February 10, 2014, Ironridge made a request for, and Scrips issued, an additional 1,615,550 shares of Scrips' common stock as a result of the adjustment provisions contained in the stipulation (the "Stipulation") in the order issued by the California state court. Scrips expensed these additional shares in December 2013, valued at $210,022, and on February 22, 2014 Scrips issued 1,615,550 shares of common stock to Ironridge.

26. On April 4, 2014, Ironridge requested an additional 1,646,008 common shares. Scrips declined to issue these additional shares because Ironridge had already received approximately 10,305,550 common shares with a market value of approximately $1,300,000 in satisfaction of $766,238.

27. On May 6, 2014, Ironridge submitted an *ex parte* application to a California state court to compel the issuance of the 1,646,008 common shares, and the California state court entered an order compelling Scrips to issue the additional shares. The order also prohibits Scrips from issuing or transferring new shares to third parties before issuing these shares. Scrips filed a notice of appeal from the California state court's order which automatically stayed the order. The matter is pending.

28. Scrips accrued the potential issuance of the shares to Ironridge during the year ended December 31, 2014 and have recorded $164,655. In October 2015, to stop a contempt action, Scrips requested that the 1,646,008 shares be issued, and such shares were ultimately issued on January 22, 2016. The shares were not accepted by Ironridge until March 17, 2016.

29. Scrips pursued an appeal, and reversal, of the California state court order and are in litigation in California and New Jersey.

30. On October 29, 2015, Ironridge, in California, requested the issuance of an

additional 87,000,000 shares under the formula set forth in the Stipulation.

31.     In New Jersey, Ironridge brought an action against Olde Monmouth, our transfer agent, to force it to issue shares or pay damages resulting from their refusal to issue the shares requested by Ironridge. Scrips intervened and contested jurisdiction in New Jersey.

32.     In January 2016, Scrips was ordered by a Federal court in California to pay for Ironridge's legal fees and, on February 22, 2016, Scrips paid same in the amount of $269,365. The Court instructed both parties to work out a mutually-agreeable settlement. Scrips believes that it has a valid defense to the issuance of the 87,000,000 shares sought by Ironridge based upon usury laws and also violations of the California business code for unconscionable actions since Ironridge paid $766,238 of debt obligations and received a return of approximately $1,300,000. However, due to expensive costs and uncertainty in litigation, Scrips believed it was in its best interest to settle the matter.

33.     On February 1, 2016, based upon its financial condition at the time, Scrips proposed the following settlement agreement to Ironridge to fully resolve all litigation and any and all claims, causes of action or potential causes of action between the parties, principals, affiliates and Scrips' transfer agent, Olde Monmouth Transfer Company:

- Scrips will make a $400,000 payment at the time the settlement agreement is fully executed and all cases are dismissed that were brought by Ironridge.

- Scrips will issue a non-interest bearing note to Ironridge in the amount of $1 million, to be paid over a ten-month period in installments of $100,000 per month, starting the month after settlement agreement and lawsuits brought by Ironridge are dismissed. This payment is in lieu of any shares to be issued to Ironridge.

- The parties will dismiss all pending litigation with prejudice, including the Los Angeles Superior Court action, the Los Angeles federal court action, the New Jersey action and the New York action. Ironridge would release any and all claims to the LNK funding ($160,000).

- The parties shall execute general releases in favor of each other and their respective officers, directors, affiliates and related parties excluding only Scrips' obligation to pay the note

specified in paragraph 2, above.

34. Ironridge notified Scrips' attorney of acceptance of this settlement on February 2, 2016 stating "Ironridge accepts this Proposal", but subsequent to signing of the final agreement, Ironridge's principal reneged on the acceptance. Scrips recorded an expense of $1,400,000 to the condensed consolidated statement of operations for the three months ended March 31, 2015 for the expected settlement amount.

35. A hearing was held on May 17th in California state on a motion filed by Scrips to enforce the settlement. At the same time, the court heard two (2) motions filed by Ironridge, one for the allowance of Ironridge's counsel fees and the other to hold the Company's board in contempt for failure to issue 87 million shares of its common stock to Ironridge. The order to issue the 87 million shares is, however, on appeal and the order is stayed under California law. At the same time, the court heard a motion by the Company's former CEO, Robert Schneiderman, to remove his name from an injunction prohibiting the issuance or transfer of his Scrips shares on the grounds that he is no longer an affiliate. At that hearing held on May 17, 2016, the Court ordered Scrips to file a supplemental brief in support of its motion by June 1 and ordered any parties that wished to respond to Scrips' brief to do so by June 17. The Court also scheduled a status conference for June 2 to set a hearing date on Scrips' motion and the other parties' pending motions, as well as to discuss the status of mediation.

36. The Ironridge litigation stems from a 2013 financing transaction entered into with Ironridge by the Scrips' then Chief Executive Officer, Robert Schneiderman, without prior approval of the Board of Directors. Despite the allegations of Ironridge's wrong-doing made by Scrips in the litigation, (which has cost the Company in excess of $1 million dollars in attorney's fees and costs, court costs, disbursements and other costs) Mr. Schneiderman filed an Affidavit in

California state court absolving Ironridge from any wrongdoing. Ironridge contemporaneously joined in a Stipulation not only to release Mr. Schneiderman from the prohibitions of a prior court injunction which Ironridge had obtained, but also generally.

37.    On July 25, 2016, the California State Court ruled that the court lacked authority to rule on Scrips' Motion to enforce the settlement and denied this Motion without prejudice and also denied Robert Schneiderman's Motion.  The Court granted Ironridge's Motion for attorney's fees and ordered Scrips to pay $300,000 or, alternatively, to post an appeal bond by September 8, 2016 and file an appeal by September 30, 2016.

*Other Developments*

38.    On Tuesday, June 7, 2016, federal agents executed a search warrant for various records of Main Avenue pertaining to the securing, filling, billing and delivery of all prescriptions, together with correspondence and business records from January, 2014 to present with respect thereto. This included paper and electronic records.  In addition, a subpoena was served calling for records of Scrips not present at the Main Avenue premises.  The documents sought were stated to be evidence of potential violations of federal law.

39.    At the meeting of Scrips' Board of Directors held on July 19, 2016, the Board considered the problem of the growing delinquencies in Scrips' required periodic filings under the Securities Exchange Act of 1934. Noting that Scrips' communication of financial information to its shareholders had been disrupted, the Board determined that it would be better to deregister under the 1934 Act and provide unaudited and unreviewed financial information on the Registrant's website and OTC Markets. Accordingly, the Board voted to file Form 15 and deregister the common stock, the only class registered.

## PART III – PLANNED COURSE FOR CASE

40. Presently, Scrips is evaluating its strategic alternatives (including potential reorganization and sale opportunities) with an eye toward confirming a chapter 11 plan. While circumstances may change, Scrips presently plans on initiating a process within four (4) to six (6) months designed to move Scrips towards emergence from bankruptcy.

## PART IV – INITIAL FILINGS

41. The Debtor either has filed, or will be filing, the following items shortly after the inception of its Chapter 11 Case:

- Motion for an Extension of Time to File Schedules of Assets and Liabilities, Statement of Financial Affairs and Initial Report of Financial Information on Entities in Which the Estate Holds a Controlling or Substantial Interest Pursuant to 11 U.S.C. §§ 105 and 521 and Federal Rules of Bankruptcy Procedure 1007, 2015.3 and 9006;

- Application Pursuant to 11 U.S.C. §§ 327(a), 328(a) and 1107(b) and Federal Rule of Bankruptcy Procedure 2014(a) and 2016 for Authority to Employ and Retain Ciardi Ciardi & Astin as Bankruptcy Counsel, *Nunc Pro Tunc* to September 7, 2016 and Request for Limited Waiver of Information-Keeping Requirements of Rule 2016-2;

- Application Pursuant to 11 U.S.C. §§ 327(e), 328(a) and 1107(b) and Federal Rule of Bankruptcy Procedure 2014(a) and 2016 for Authority to Employ and Retain Bolognese & Associates, LLC as Special Litigation Counsel, *Nunc Pro Tunc* to September 7, 2016 and Request for Limited Waiver of Information-Keeping Requirements of Rule 2016-2; and

- Motion for an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Estate Professionals.

42. I have reviewed each of the above-referenced items and believe that they are necessary to allow the Debtor to proceed with its bankruptcy filing in an orderly process and to support its efforts to maximize value for the Debtor's estate.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief under penalty of perjury.

Dated: September 7, 2016
Houston, Texas

_____
Brian Ettinger
Chairman of Board and
Chief Executive Officer