**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>SCRIPSAMERICA,<br><br>Debtor. | Chapter 11<br><br>Case No. 16-11991(LSS)<br><br>**Hearing Date: to be scheduled**<br>**Objections Due: to be scheduled** |

**MOTION OF THE UNITED STATES TRUSTEE TO
CONVERT THIS CHAPTER 11 CASE TO A CHAPTER 7 CASE**

Andrew R. Vara, the Acting United States Trustee for Region Three ("U.S. Trustee"), through his counsel, files this Motion (the "Motion") for the entry of an order converting the Chapter 11 case to a case under Chapter 7 pursuant to 11 U.S.C. § 1112(b). In support thereof, the U.S. Trustee respectfully states as follows:

## I. PRELIMINARY STATEMENT

1. Irrespective of the considerable litigation that has occurred in this case, it appears to be undisputed by all active parties-in-interest that this case is headed for the appointment of a trustee to liquidate the estate's assets for the benefit of creditors, either through a chapter 11 liquidating plan or through conversion of the case to Chapter 7. The debtor-in-possession has concluded its sale efforts, with meager results, and the extensive administrative expenses being incurred in the case far exceed the sale proceeds. Cause exists to convert this Chapter 11 case to a Chapter 7 case now in order to stem the accumulation of further administrative expenses, and to end the continuing estate diminution resulting from litigation that appears unlikely to confer any net benefit to the estate and the creditor body as a whole.

## II. JURISDICTION

2. Pursuant to (i) 28 U.S.C. § 1334, (ii) applicable order(s) of the United States

District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and (iii) 28 U.S.C. § 157(b)(2)(A), this Court has jurisdiction to hear and determine this Motion.

3. Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of cases commenced under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts to guard against abuse and over-reaching to assure fairness in the process and adherence to the provisions of the Bankruptcy Code. *See In re United Artists Theatre Co.*, 315 F.3d 217, 225 (3d Cir. 2003) ("U.S. Trustees are officers of the Department of Justice who protect the public interest by aiding bankruptcy judges in monitoring certain aspects of bankruptcy proceedings."); *United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 298 (3d Cir. 1994) ("It is precisely because the statute gives the U.S. Trustee duties to protect the public interest…that the Trustee has standing to attempt to prevent circumvention of that responsibility." ); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 499 (6th Cir. 1990) ("As Congress has stated, the U.S. trustees are responsible for 'protecting the public interest and ensuring that the bankruptcy cases are conducted according to [the] law"). Congress created the United States Trustee Program to act as a "watchdog" in bankruptcy cases. *See* H.R. Rep. No. 95-595 at 88 (1977).

4. The U.S. Trustee has standing to be heard on this Motion pursuant to 11 U.S.C. § 307.

## III. STATEMENT OF RELEVANT FACTS

### A. PROCEDURAL BACKGROUND

5. On September 7, 2016, (the "Petition Date") the Debtor or "Scrips" commenced

this Chapter 11 case. Scrips is essentially a holding company with several subsidiaries that did not file for bankruptcy relief.

6. On September 8, 2016, the U.S. Trustee solicited creditors to serve on an Official Committee of Unsecured Creditors. Scrips' largest creditors list is comprised, for the most part, of professionals holding claims totaling $414,491.31. The remaining listed creditors consist of:

a. BK Bank, SSB, d/b/a Triumph Healthcare Finance, with an unsecured guaranty claim of $2,018,727.51;
b. AcquiPharm, Inc. with a note payable of $473,602.00;
c. NASDAQ, with a claim of $2,740; and
d. Robert Schneiderman ("Schneiderman") with three claims totaling $242,000.00 and consisting of $132,000 for a "Settlement"; $80,000 for a "Note Payable" and $30,000 for a "Credit Card".

Scrips did not list a large litigation claimant, Ironridge Global Partners, LLC ("Ironridge"), on its largest creditor list, but describes Ironridge's claim in the Schedules as contingent, unliquidated and disputed, with the amount listed as "unknown."

7. On October 17, 2016, the U.S. Trustee conducted the Section 341 meeting of creditors.

8. On November 3, 2016, after reviewing three questionnaires received from creditors who indicated a willingness to serve on a creditors' committee, the U.S. Trustee appointed a two-member creditors' committee (the "Committee") comprised of Schneiderman and Ironridge. *See*, Notice of Appointment of Official Committee of Unsecured Creditors. (D.I. 71).

9. The appointment of the Committee was quickly followed by extensive litigation, first from the Debtor, and then by the Committee, regarding the Committee's ongoing status. Specifically, on November 3, 2016, the Debtor filed a motion requesting that the Court disband the Committee (D.I. 75) and also sought discovery in connection therewith (D.I. 80, 81). In

response, on November 16, 2016, the Committee moved to Quash the Debtor's Notices of Deposition Relating to the Motion to Disband the Committee and also sought a Protective Order. (D.I. 84). Both the U.S. Trustee and the Committee filed objections to the Debtor's Motion to Disband the Committee. (D.I. 93, 94).

10. Subsequent to a November 22, 2016 hearing, on or about November 30, 2016, the pending litigation regarding the Committee's status was continued by the Debtor and the Committee as they appeared to be attempting a rapprochement. However, on January 5, 2017, the Committee objected to the Debtor's exclusivity motion and sought to terminate exclusivity (D.I. 126-130), effectively ending the temporary truce and again placing the Debtor's Motion to Disband the Committee back before the Court. The U.S. Trustee then filed a notice unilaterally disbanding the Committee on January 11, 2016. (D.I. 143).

11. On January 16, 2017, the Debtor filed its own plan and disclosure statement (D.I. 156), pursuant to which a post-confirmation trustee (a chapter 7 trustee panel member would serve in that position) would be appointed to liquidate the remaining assets of the Debtor's estate, most likely including causes of action against members of the Committee. The Committee also has pending a complaint seeking a declaratory judgment regarding its ongoing status in the case. (D.I. 183) (*See also* Adv. Pro. No. 17-50010).

12. The Debtor's December 2016 Monthly Operating Report ("MOR") (D.I. 181) indicates that post-petition liabilities total $653,243, consisting of (i) accrued professionals fees of $415,333, (ii) accounts payable of $27,635, (iii) taxes payable of $5,550, and a (iv) $204,725 increase in a reported $4,526,956 inter-company obligation accruing since the Petition Date.

**B. SCRIPS' BUSINESSES**

13. Brian Ettinger, the Debtor's Board Chairman since May 17, 2011, and the Chief

Executive Officer since June 30, 2015, describes Scrips as in the business of distributing prescription and over-the-counter pharmaceuticals. *See* Declaration of Brian Ettinger, Chief Executive Officer and Chairman of the Board of Directors of the Debtor in Support of Chapter 11 Petition and Initial Filings dated September 7, 2016 ("Ettinger Declaration") at ¶ 6. (D.I. 3). At least at this juncture, Scrips is essentially a holding company, with ownership interests in the following entities:

- Main Avenue Pharmacy, Inc. ("MAVP") (a wholly owned subsidiary);
- Pharmacy Administration (a wholly owned subsidiary recently sold and pending a sale closing);
- PIMD International, LLC ("PMID") (90% interest); and
- Wholesale Rx, Inc. (14% interest).

*See* Ettinger Declaration at ¶ 7 and ¶ 17.

14. MAVP generated significant revenues at one time, but has ceased operations. In 2015, MAVP generated gross revenue of $38,326,000, followed by gross revenues of $13,361,000 in the first half of 2016. Ettinger Declaration at ¶ 14. On March 4, 2015, one of MAVP's contract parties, CVS/Caremark, notified MAVP that it was terminating its provider agreement with MAVP. No basis for the termination was provided. Ettinger Declaration at ¶ 10. During the three months ended March 31, 2015, CVS/Caremark represented approximately 26% of Scrips' net revenues. Ettinger Declaration at ¶ 10. Approximately one year later, on or about April 5, 2016, Express Scripts, Inc. ("ESI") advised MAVP that it had initiated an investigation of a telemarketing doctor who wrote a large number of prescriptions which were filled by MAVP. Ettinger Declaration at ¶ 11. Pending completion of its investigation, and based on ESI's assertion that the doctor did not have an appropriate relationship with the patients, ESI held approximately $3.55 million of MAVP's funds and indicated that it might demand reimbursement of prior payments traceable to prescriptions written by the doctor.

Ettinger Declaration at ¶ 11. MAVP had received prescriptions from the doctor at issue from approximately the fourth quarter of 2014 through approximately the first quarter of 2016. Ettinger Declaration at ¶ 11. On or about June 7, 2016, federal agents executed a search warrant upon MAVP, seizing its records and files and effectively shutting the business down as of August 31, 2016. Ettinger Declaration at ¶ 23, 38, see also Schneiderman Complaint at ¶¶ 32-33 (D.I. 91).

15. Pharmacy Administration provides billing and administrative services to independent pharmacies and holds an interest in a retail pharmacy. Pharmacy Administration had no revenues in 2015 or in the first six months of 2016. Ettinger Declaration at ¶ 15.

16. PIMD is a wholesaler to independent pharmacies and other medical providers. PIMD is currently licensed in 19 states, and during calendar year 2015, PIMD generated gross and net revenue of $1,955,000. During the first six months of calendar year 2016, PIMD generated gross and net revenue of $2,375,000. Ettinger Declaration at ¶ 16.

17. On October 14, 2016, the Debtor filed a motion for authority to sell its business assets (D.I. 44) and obtained an Order Approving Sale Procedures and Scheduling an Auction and Hearing to Consider Approval of Sale (D.I. 73, 79).

18. At the January 25, 2017 hearing to approve the asset sale, the Court approved the sale of Pharmacy Administration to the highest bidder for the total sum of $150,000. From that sum, $45,000 will be paid to Equity Partners HG, LLC, the Debtor's Investment Banker.[1] The Debtor received no bids for any of its other business interests.

## C. LITIGATION

### *The Ironridge Non-Bankruptcy Litigation*

---

[1] Equity Partners maintains an additional unpaid post-petition administrative claim for $30,000.

19. Ironridge's claims have their origin in a transaction for the issuance of Scrips stock in return for the satisfaction of certain debt which resulted in a November 8, 2013, court-approved stipulation (the November 2013 Stipulation") between Ironridge Global IV, Ltd. ("Global IV") and Scrips. Pursuant to the November 2013 Stipulation, Scrips was to issue 8,690,000 shares of common stock to Global IV in satisfaction of certain outstanding accounts payables. *See*, Ettinger Declaration at ¶ 24; *see also* Exhibit A of Exhibit C to the Debtor's Objection to the Committee's Motion for a Protective Order at D.I. 90-3.

20. The above-described Ironridge transaction has resulted in a legacy of litigation, culminating in the California Superior Court ruling that (i) Ironridge was entitled to 87,031,631 shares; and (ii) enjoining multiple persons, including but not limited to Scrips, Olde Monmouth Stock Transfer Co. ("Olde Monmouth") and its principal, from issuing or transferring shares to any person other than Ironridge until Ironridge had received the shares to which it was entitled. *See* Schneiderman Complaint at ¶ 21; Ironridge POC - Complaint at ¶ 45. Moreover, Ironridge has a pending complaint for malicious prosecution and damages in the Central District of California under Civil Case No. 2:16-CV-05335. The plaintiffs to this action include Global IV, Mr. Kirkland, as well as Ironridge. *See* Ironridge POC.

21. Ironridge also sued Olde Monmouth in New Jersey State Court seeking, at first, the shares of stock and damages, and thereafter amending its complaint on July 13, 2106, seeking only monetary damages of approximately $19 million based on the lost value of the 87,031,631 shares of stock. *See* Exhibit C to the Debtor's Objection to the Motion for a Protective Order. (D.I. 90); *see also* Ettinger Declaration at ¶ 31.

***The Schneiderman Non-Bankruptcy Litigation***

22. Schneiderman was the Debtor's CEO, president, and secretary through June 30,

2015, when he resigned all positions and executed a severance agreement. The Debtor suspended payments under the severance agreement in August 2015, alleging Schneiderman's breach of such agreement. Ettinger Declaration at ¶ 17.

23. On or about November 18, 2016, the Debtor filed a complaint against Schneiderman in the U.S. District Court for the Eastern District of Pennsylvania, Civil Case No. 2-cv-16-06081-PD. *See*, the Debtor's Objection to Motion for a Protective Order (D.I. 91). The complaint identified two main claims against Schneiderman, namely (i) that Schneiderman engaged in unauthorized dealings with Global IV and (ii) that his gross mismanagement of MAVP led to the destruction of MAVP's business, which had it been run properly, would have been a viable and successful ongoing legitimate business generating millions of dollars of profit for itself and Scrips. *Id*.

24. The Debtor's SEC filings reflect the involvement of other members of Scrips management in both MAVP and the Ironridge transaction. Although Scrips emphasizes Schneiderman's role in MAVP, the Scrips 10-Q for the quarter ended March 31, 2014 also describes involvement by Scrips' own legal counsel and his company, Implex Corporation, in the acquisition of MAVP, including the funding of that acquisition. *See*, Scrips 10-Q for the quarter ended March 31, 2014 at pp. 20, 21, 47, 64-66. Moreover, although Schneiderman departed from Scrips on June 30, 2015, the federal seizure did not take place until early June of 2016. Additionally, when ESI discovered the robo-signed physician's signatures, Schneiderman had already departed from Scrips for much of a year. If, as alleged, Schneiderman had been advised by outside counsel to install and implement internal controls over marketers and to require legally proper employment agreements to ensure compliance with applicable laws, including federal anti-kickback laws, then any subsequent or continuing failure to make such changes in

MAVP's operations may present subsequent and current management with issues of potential claims and causes of action.

25. With respect to allegations that Schneiderman acted without corporate authority and that the Board was unaware of the Ironridge transaction and the November 2013 Stipulation until after the fact, such statements are contradicted by the November 2013 Stipulation in that it was also apparently signed by Jeffrey Andrews, the Debtor's Chief Financial Officer. Moreover, the November 2013 Stipulation contained certain representations and warranties that Scrips had full corporate authority and Board approval to enter into the Stipulation.[2]

***Recent Bankruptcy Court Litigation***

26. The Debtor filed an adversary proceeding in this court which is a turnover action against Global IV and others where the funds at issue were earlier deposited with the Suffolk County (New York) Comptroller. Upon information and belief, Global IV has asserted title, including attorney fees and costs associated with Global IV's collection efforts, to the funds. These funds appear to be estate property but Global IV is also apparently asserting a claim to the funds which claim, if pressed, hampers the estate's ability to marshal its assets and ultimately prejudices the estate and other unsecured creditors.

## IV. IV. LEGAL ANALYSIS AND ARGUMENT

27. Cause exists to immediately convert this Chapter 11 case to a Chapter 7 case, in order to stem the continuing diminution of the estate through pre-confirmation litigation and the

[2] The 10-Q for the quarterly period ending March 31, 2014 described the Ironridge litigation and did not identify any fraud or lack of corporate authority to enter into the November 2013 Stipulation. In particular, it stated that "[w]e believe that Ironridge is not entitled to additional shares as it has received a significant premium on the Final Amount which Ironridge itself had declared to the California State Court served as the basis of the adjustment mechanism for the number of shares issued based on the Company's stock price. We will vigorously pursue the appeal, and reversal, of the California State Court order." See SEC 10-Q for the quarterly period ending March 31, 2014 at pp. 61-62. In addition, the 10-Q was signed by both Schneiderman and Mr. Andrews.

cost and delay associated with a confirmation process, neither of which appear to confer any benefit to the estate or the creditor body as a whole. It appears to be undisputed by all active parties-in-interest that the appointment of a trustee to liquidate the estate's assets for the benefit of creditors is inevitable. Now that the debtor-in-possession has conducted its sale efforts (unfortunately, with meager results), the case should be converted to Chapter 7 to stop the further accrual of administrative expenses, which far exceed the funds on hand.

28. The statutory grounds for conversion are set forth in 11 U.S.C. § 1112 (b)(1), which provides:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

29. A nonexhaustive list of grounds constituting "cause" is provided in 11 U.S.C. § 1112(b)(4), including: "(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; . . ." 11 U.S.C. § 1112(b)(4)(A).

30. Creditors, as well as investors, require an independent, conflict-free, experienced fiduciary investigating the financial affairs of this debtor, someone who can determine an appropriate liquidation strategy, free from the constraints of the litigious parties in this case. The current situation is akin to that considered by the Third Circuit in *In re Marvel Entertainment Group., Inc.*, 140 F. 3d 463, 473 (3d Cir. 1998), where the Court found the appointment of a chapter 11 trustee appropriate in light of the parties' inability to reach a consensus, the flinging of accusations at each other, the failure to demonstrate an ability to cooperatively resolve matters, and the lack of a reasonable likelihood of any cooperation between the parties in the near future. *Id*. (citing *Cajun Elec. Power Coop., Inc.* 74 F. 3d 599, 600 (5th Cir. 1996)).

31. The acrimony that exists between the Debtor and its most significant creditors, including those creditors formerly on the Committee, provides sufficient "cause" for the appointment of a trustee based on the facts of the instant case. Such acrimony is evident from a review of the docket, the various contested matters, and the many pleadings filed in this bankruptcy case, as well as the transcript of the November 22, 2016 hearing. Moreover, such antagonism appears likely to continue, and the positions of the parties have only hardened as the case has continued. The prospects for a recovery for unsecured creditors decrease with each additional day in this dysfunctional Chapter 11 case.

32. Where there is sufficient "acrimony" between the creditors and a debtor, courts have not hesitated to appoint a trustee to address the issues the parties became incapable of handling in the absence of a trustee. *See, e.g., Marvel Entm't Grp., Inc.*, 140 F.3d at 472-73 (ordering the appointment of a chapter 11 trustee); *In re Plaza de Retiro, Inc.*, 417 B.R. 632, 640-41 (Bankr. D.N.M. 2009) ("[t]he Court has observed that acrimony between a debtor-in-possession's management and the creditors that impedes the reorganization effort has routinely been found to constitute a ground for appointing a trustee.*"); Petit v. New England Mortg. Servs., Inc. (In re Petit)*, 182 B.R. 64, 70 (D. Me. 1995) ("deep-seeded conflict and animosity between a debtor and its creditors provides a basis for the appointment of a trustee."); *In re Biolitec, Inc.*, Case No. 13-11157 (DHS), 2013 WL 1352302, at *13 (Bankr. D.N.J. Apr. 3, 2013) (appointing trustee due to deep-seeded conflicts between the parties and their inability to resolve such conflicts). Acrimony exists "when the inherent conflicts extend beyond the healthy conflicts that always exist between debtor and creditor, or . . . when the parties begin working at cross- purposes" and that acrimony or lack of cooperation jeopardizes the reorganization process. *Id.*; *see also In re Bellevue Place Assocs.*, 171 B.R. 615, 625 (Bankr.

N.D. Ill. 1994) (detailing a situation where the parties were at a standstill on reorganization efforts and a "disinterested trustee was required to unfreeze and facilitate the decision making process"); *In re Emerging Commc'n*, No. 06-30007-JKF, 2007 Bankr. LEXIS 4763, at *26-27 (Bankr. D.V.I. Feb. 13, 2007) (appointing a trustee where "the parties [were] embarked-on a course of litigation in [the] cases which, coupled with the acrimony between them, clearly and convincingly demonstrate[d] to the court that a neutral party [was] needed to investigate and determine whether or not to pursue (or defend, as the case may be) actions on behalf of the estates.").

33. The reason behind the appointment of a trustee in *Marvel*, and the other cases cited above, is also unfortunately present in this bankruptcy case and shows no signs of abatement. The discordant and antagonistic atmosphere, which existed pre-petition, persists throughout the bankruptcy case, illustrated by: (i) the Debtor's Motion to Disband the Committee (D.I. 75), (ii) the submission of competing orders on the Committee's Motion for the Protective Order (D.I. 98, 100), (iii) the Debtor's Motion to Strike Limited Objection of Former, Disbanded Committee (D.I. 166); (iv) the Notice of Deposition of Bayard, P.A. (D.I. 168); (v) the Notice of Deposition of Former, Disbanded Official Committee of Unsecured Creditors (D.I. 169); (vi) Bayard, P.A.'s Motion for Protective Order (D.I. 175); and (vii) the Debtor's Objection to Motion for Protective Order (D.I. 179).

34. Additionally, the fact that the Debtor's Plan provides that certain claims will be settled or released prior to the Plan's Effective Date with the remaining claims and actions, if any, to be subsequently addressed by a liquidating trustee, makes it painfully apparent and almost certain that litigation between and among these parties will continue pre-confirmation, and will pit the Debtor against the former Committee members (and possibly others). The

Debtors and those Committee members are engaged in a constant struggle, inflicting harm upon the estate and rest of the creditor body, particularly in the form of increased administrative expenses and delay. Each event in this case seems to result in a contest, and progress towards an efficient resolution of issues is being stymied as a result. This is unnecessary when, in fact, there appears to be consensus that the Chapter 11 case should ultimately result in the appointment of a neutral liquidating trustee who will serve as a fiduciary.

35. The Debtor has fully marketed its assets and was only able to sell its interest in Pharmacy Administration. The modest sum brought into the estate as a result of the sale is woefully insufficient to satisfy administrative expenses incurred thus far. To the extent that there may be value in litigation assets that litigation will need to be pursued on a contingency fee basis later, with the hope that chapter 11 administrative expenses might someday be paid from those proceeds. In the meantime, as disputes between the Debtor and particular creditors persist, the Chapter 11 case moves no closer to resolution, and the recoveries for unsecured creditors, if any, continue to fade. Based on the facts and circumstances that plague this bankruptcy case, "cause" exists to convert this case and to appoint a chapter 7 trustee to serve as an estate fiduciary.

36. The above-described circumstances demonstrate a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation of the Debtor. "Rehabilitation," as the term is used in 11 U.S.C. § 1112(b)(4)(A), means "to put back in good condition; re-establish on a sound, firm basis." 5 COLLIER ON BANKRUPTCY § 1112.03(2) (15th ed. 1980) (quoted in *re L.S. Good & Co.*, 8 B.R. 315, 317 (Bankr. N.D. W.Va. 1980)). "Under the interpretation of section 1112(b)(1) consistently used in bankruptcy courts, [a] negative cash flow situation alone is sufficient to establish 'continuing loss to or diminution of

the estate." *Loop Corp. v. United States Trustee (In re Loop Corp.)*, 379 F.3d 511, 515-16 (8th Cir. 2004).

37. The Debtor has already taken advantage of its opportunity to liquidate estate assets, with little or no benefit to the estate. A Chapter 7 trustee can conclude this case more efficiently than the debtor-in-possession, neutralize the acrimony that has permeated the case, and proceed to take whatever actions are appropriate to benefit all creditors, parties in interest, and the estate.[3]

**THIS SPACE LEFT BLANK INTENTIONALLY**

[3] The U.S. Trustee reserves any and all rights, remedies, duties and obligations to, among other things, complement, supplement, augment, alter, substitute and/or modify this Motion and to conduct any and all discovery as may be required or deemed necessary, and to assert such other grounds as may become apparent.

## V. <u>CONCLUSION</u>

WHEREFORE, the U.S. Trustee respectfully requests that this Court enter an order converting the Chapter 11 case to a case under Chapter 7, and requests such other relief as the Court deems just, fair, and equitable.

Dated: January 30, 2017
Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**ACTING UNITED STATES TRUSTEE**
**REGION THREE**

By: *<u>/s/ Richard L. Schepacarter</u>*
Richard L. Schepacarter
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Room 2207
Wilmington, DE 19801
(302) 573-6491
(302) 573-6497 (fax)