## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| SCRIPSAMERICA, INC., *et al.*, | Case No. 16-11991 (JTD) |
| Debtors.[1] | (Jointly Administered) |
| CHARLES A. STANZIALE, JR., Chapter 7 Trustee of SCRIPSAMERICA, INC., | Adv. Proc. No. 18-50724 (JTD) |
| Plaintiff, | |
| v. | |
| IRONRIDGE GLOBAL IV, LTD, LNK INTERNATIONAL, INC. a/k/a L.N.K. INTERNATIONAL, INC. and the SUFFOLK COUNTY COMPTROLLER, | **Hearing Date: December 9, 2021 at 10:00 a.m.** **Objection Deadline: November 23, 2021 at 4:00 p.m.** |
| Defendant. | |

### MOTION OF THE CHAPTER 7 TRUSTEE FOR APPROVAL OF SETTLEMENT PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, INCLUDING RESOLUTION OF PENDING ADVERSARY PROCEEDINGS, OTHER LITIGATION AND CLAIMS, RELIEF FROM THE AUTOMATIC STAY, AND FOR RELATED RELIEF

Charles A. Stanziale, Jr., in his capacity as the duly appointed trustee (the

"**Trustee**") of the chapter 7 bankruptcy estate (the "**Estate**") of Debtor ScripsAmerica,

Inc. (hereafter, either "**Debtor**" or "**ScripsAmerica**"), requests entry of an order

substantially in the form attached hereto as **Exhibit A** (the "**Settlement Approval**

**Order**") approving the settlement as set forth and described in the Settlement Agreement

attached to the proposed Order as **Exhibit 1** and as is summarized herein (the

"**Settlement**") by and among the Trustee on behalf of the Debtor's Estate, Ironridge

Global Partners ("**Ironridge Partners**"), Ironridge Global IV Ltd. ("**Global IV**" and

---

[1] The Debtors in these cases, along with the last four digits of the federal tax identification number for each of the Debtors, are: ScripsAmerica, Inc. (8594) and Main Avenue Pharmacy, Inc. (6335).

collectively with Ironridge Partners, "**Ironridge**"), John Kirkland and Brendan O'Neill (collective references to Ironridge, Global IV and Messrs. Kirkland and O'Neill hereafter shall be to the "**Non-Trustee Settling Parties**").

In support hereof, the Trustee respectfully represents as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.    As described in greater detail below, since 2013 there have been at least nine litigation matters involving the Debtor, as either plaintiff or defendant, the Trustee as representative of the Estate, and one, some or all of the Non-Trustee Settling Parties; some filed in various non-bankruptcy courts prior to the commencement of this bankruptcy case and some (two by the Debtor and one by the Trustee) filed as adversary proceedings in this Court.

2.    All of such litigation was spawned by transactions involving the Debtor and Ironridge dating back to 2013, years before the petition date, in which Ironridge lent money to the Debtor and, when Debtor could not repay the loan, Ironridge commenced a lawsuit against the Debtor in California state court (as further defined and described below, the "**California Collection Action**").  The matter was settled by the Debtor and Ironridge by their entry into a Stipulated Judgement (as defined below) which provided, inter alia, for repayment of the moneys loaned through the issuance by the Debtor of its stock to Ironridge.  Since then the Debtor, in effect, attempted to get out of its obligations to Ironridge by litigation in which it accused Ironridge of securities fraud and other alleged claims, which Ironridge won when such matters were litigated, but which the Debtor continued to try to re-litigate and resurrect, all as will be explained in detail below.

3.      After conversion the Trustee and the Non-Trustee Settling Parties discussed the various litigations and other matters as between the Estate and the Non-Trustee Settling Parties.  After extensive negotiations, the agreement reached, as set forth in the Settlement Agreement, by and among the Trustee and the Non-Trustee Settling Parties is for, *inter alia*,[2] (i) discontinuance and/or dismissal to the extent the Estate or the Debtor are parties of certain adversary proceedings pending in this Court and certain litigation matters pending in various non-bankruptcy courts, including but not limited to a state court case for which the Debtor faced a potential indemnity claim, (ii) a 50/50 split as between the Estate and Global IV of certain funds interplead in one of the pending non-bankruptcy court litigation matters, (iii) retention by the Non-Trustee Settling Parties of any and all claims they have against any parties other than the Estate in the non-bankruptcy court pending litigations (the "**Non-Bankruptcy Litigation**") and authorization for the Non-Trustee Settling Parties to fully pursue the Non-Bankruptcy Litigation against any such parties, (iv) termination of the automatic stay of 11 U.S.C. § 362(a) with respect to the Non-Bankruptcy Litigation, to the extent necessary to allow such matters (against non-Estate related parties) to proceed in the non-bankruptcy courts, (v) expungement of the claim filed by Ironridge Global Partners, and (vi) mutual general releases by the Non-Trustee Settling Parties and the Trustee on behalf of the Estate.

4.      The Chapter 7 Trustee submits that the Settlement is the product of good-faith, arms-length discussions and negotiations between himself on behalf of the Estate and the Non-Trustee Settling Parties and falls well within the range of reasonably anticipated outcomes if all the pending litigation matters and claims were to be fully

---

[2]      The summary of the Settlement as set forth in this Motion is qualified by, and subject to, the terms thereof as set forth in the Settlement Agreement.

litigated to conclusion.  Accordingly, the Chapter 7 Trustee submits that the Settlement described herein and as set forth in the Settlement Agreement can and should be approved by this Court.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* issued by the United States District Court for the District of Delaware dated February 29, 2012.

6.      This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

7.      The Trustee confirms his consent pursuant to LR 9013-l(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, could not have entered a final order or judgment consistent with Article III of the United States Constitution.

8.      The statutory bases for the relief sought herein are Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and, as such may be applicable, section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**").

## BACKGROUND

### General Background

9.      On September 7, 2016, ScripsAmerica commenced the above-captioned case by filing its voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "**Petition Date**").

38165667v.1 128239/00013

10. On January 30, 2017, the United States Trustee moved to convert [D.I. 192] (the "**Motion to Convert**").

11. By its order of February 7, 2017 [D.I. 217], the Court granted the Motion to Convert.

12. On February 9, 2017, the Trustee was appointed.

## PRE-BANKRUPTCY TRANSACTIONS AND LITIGATION BETWEEN DEBTOR AND THE NON-TRUSTEE SETTLING PARTIES

13. The business relationship, and resulting litigation, involving the Debtor and the Non-Trustee Settling Parties stretches back to 2013, well prior to the Petition Date. It started with a loan, a failure by the Debtor to re-pay the loan, an action to collect, and a resolution of such action; and subsequently produced several other litigation matters that were pending as of the commencement of the captioned bankruptcy case and spawned two adversary proceedings in this case.

### *The California Collection Action*

14. On October 11, 2013, Global IV commenced an action in California Superior Court captioned Ironridge Global IV, Ltd. v. ScripsAmerica, Inc., Case No. BC524230, to collect a debt due from ScripsAmerica in the amount of $686,962.08, plus interest and attorneys' fees (the "**California Collection Action**").

15. ScripsAmerica admitted its indebtedness to Global IV in the California Collection Action and a stipulated judgment was entered by the California Superior Court (the "**Stipulated Judgment**"), providing for ScripsAmerica to issue stock to Global IV of a value equal to ScripsAmerica's conceded indebtedness to Global IV. The Stipulated Judgment also included a mechanism pursuant to which additional stock would be issued if the value of stock previously issued did not meet certain agreed benchmarks.

16.     The Stipulated Judgement approved by the California Superior Court provides that ScripsAmerica's issuance of stock to Global IV was being made pursuant to the exemption contained in section 3(a)(10) of the Securities and Exchange Act of 1933 (15 U.S.C. § 77a *et seq.*) which provides, in part:

> [A]ny security which is issued in exchange for one or more bona fide outstanding … claims … or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court or by any official or agency of the United States ….

17.     Pursuant to the mechanism contained in the Stipulated Judgment, ScripsAmerica issued additional stock to Global IV but later, and contrary to its obligations thereunder, refused to do so.  The California Superior Court thus entered an order requiring ScripsAmerica to issue additional shares to Global IV and proscribed issuance of shares by ScripsAmerica to any other person or entity until it had complied with its obligations to Global IV.

18.     ScripsAmerica appealed from this order, but its appeal was dismissed, and its request for review was denied.  Ironridge Global IV, Ltd. v. ScripsAmerica, Inc., 238 Cal. App. 4th 259 (2015), review denied, No. S228390 (Cal. Sept. 30, 2015).  The California Court of Appeal determined that ScripsAmerica's legal arguments on appeal were "plainly without merit," 238 Cal. App. 4th at 267; and awarded Global IV its attorneys' fees in connection with the appeal. *Id*. at 268

19.     Despite its loss on appeal, ScripsAmerica continued to refuse to issue shares to Global IV as required, causing the California Superior Court to enter another enforcement order, with which ScripsAmerica also did not comply. ScripsAmerica moved to set aside the original Stipulated Judgment, which was denied.

- 6 -

20.     ScripsAmerica then filed a motion to enforce an alleged settlement and peremptorily sought sanctions against Global IV and Mr. Kirkland personally on the ground that any opposition to ScripsAmerica's motion would be frivolous and in bad faith.  This motion also was denied.

21.     In March 2015, ScripsAmerica sought a different forum for the same issues being litigated in California, filing a declaratory judgment action in New Jersey, where it maintained its principal place of business.  ScripsAmerica sought a declaration that California law imposed a stay on its issuance of any further shares.   After the California Superior Court clarified its prior orders at the request of the New Jersey court, the New Jersey action was dismissed.  Undeterred, on February 6, 2017, the day before commencement of the hearing on the United States Trustee's Motion to Convert, ScripsAmerica commenced an action in the Central District of California against Global IV and Ironridge Partners alleging breach of contract with respect to the alleged settlement agreement which ScripsAmerica already had sought, but had failed, to "enforce" in the California Collection Action.

*The Securities Action*

22.     On May 22, 2014, without having complied with the California Superior Court's enforcement orders, ScripsAmerica commenced an action in the United States District Court for the Central District of California (the "**Central District of California**") against Global IV, and also against Ironridge Partners, Mr. Kirkland and Mr. O'Neil, captioned as ScripsAmerica, Inc. v. Ironridge Global IV, Ltd. et al., Case No. CV 14–03962 MMM (C.D. Cal.), alleging they had committed securities fraud (the "**Securities Action**").

23.     Despite twice being granted leave to amend, ScripsAmerica was unable to state any claims for relief against the Non-Trustee Settling Parties in the Securities Action.  After its third unsuccessful attempt to do so, the Central District of California dismissed the action with prejudice.  See 119 F.Supp.3d 1213, 1264-65 (C.D. Cal. 2015).

***The LNK Litigation***

24.     One of ScripsAmerica's obligations which Global IV contends gave rise, in part, to the indebtedness dealt with in the California Collection Action, was ScripsAmerica's $275,000 debt to LNK International, Inc. ("**LNK**"), a manufacturer of over-the-counter pharmaceutical products.  ScripsAmerica issued a purchase order to LNK for $275,000 worth of product.  Global IV contends that it, not ScripsAmerica, paid LNK for the product subject to the purchase order pursuant to an agreement in which Global IV purchased LNK's right to payment thereunder.

25.     On or about November 17, 2015, ScripsAmerica sued LNK in New York state court alleging it had paid LNK the $275,000 and that it was due a refund of $160,519.82 based on LNK's failure to deliver satisfactory products as required by the purchase order.

26.     LNK advised Global IV of the pending action and that it would remit the $160,519.82 to ScripsAmerica unless Global IV acted.  Global IV commenced an action in New York state court against LNK and against ScripsAmerica seeking the refund (the "LNK State Court Action").  Thereafter, LNK interpleaded the $160,519.82 with the New York court.  Based thereon, ScripsAmerica's suit against LNK was dismissed and the $160,519.82 (the "**LNK Funds**") remained with the clerk of the New York court pending resolution of the LNK State Court Action.

27.    After commencement of this bankruptcy case, ScripsAmerica commenced an adversary proceeding in this Court against Global IV, LNK and also against the Suffolk County, New York Comptroller (with which the LNK Funds were deposited), Adv. No. 16-51960 (the "**Debtor LNK Adversary**").  This adversary proceeding raises the same or similar issues as the LNK State Court Action, and remains pending.

28.    On September 6, 2018, the Chapter 7 Trustee filed an adversary proceeding against Global IV, LNK and the Suffolk County Comptroller, Adv. No. 18-50724 (LSS) (the "**Trustee LNK Adversary**"), which action also concerns the LNK Funds, and remains pending.

### *The Olde Monmouth Litigation*

29.    The Stipulated Judgment in the California Collection Action providing a mechanism for issuance of ScripsAmerica stock also provided that ScripsAmerica would deliver an irrevocable authorization and instruction to its transfer agent, New Jersey-based Olde Monmouth Stock Transfer Company, Inc. ("**Olde Monmouth**"), requiring compliance with any requests by ScripsAmerica or Global IV to issue shares. ScripsAmerica delivered such a letter to Olde Monmouth on November 8, 2013 (the "**Irrevocable Instruction**"), which Olde Monmouth acknowledged and agreed to in writing.

30.    Olde Monmouth initially complied with several of Global IV's requests to issue shares, but on April 4, 2014, at ScripsAmerica's direction, Olde Monmouth began to ignore the Irrevocable Instruction and refuse Global IV's requests for additional issuances.  Despite the subsequent entry of multiple orders by several courts confirming the Stipulated Judgment's validity, Olde Monmouth continued to follow ScripsAmerica's

direction to refuse all of Global IV's subsequent issuance requests.  On March 3, 2015, ScripsAmerica and Olde Monmouth entered an agreement providing that ScripsAmerica would indemnify Olde Monmouth for all losses, including damages and attorney's fees, incurred in any litigation arising from its refusal to issue the requested shares.

31.    On March 6, 2015, Global IV commenced an action in New Jersey state court captioned Ironridge Global IV, Ltd. v. Olde Monmouth Stock Transfer Co., Inc., Docket No. L-772-15 (N.J. Super. Ct.) (the "**Olde Monmouth Litigation**"), in which it seeks monetary relief for Olde Monmouth's breach of the Irrevocable Instruction.  On May 29, 2015, ScripsAmerica was granted leave to intervene in that action as a defendant.

32.    Following commencement of ScripsAmerica's bankruptcy case, Olde Monmouth, supported by ScripsAmerica, requested that the Olde Monmouth Litigation be stayed pursuant to § 362(a) of the Bankruptcy Code.  Olde Monmouth argued that, because of its indemnification agreement with ScripsAmerica, any judgment against Olde Monmouth or even its continued participation in the case would impact the Estate, and impede the Debtor's reorganization.[3]  On January 24, 2018, the New Jersey state court granted Olde Monmouth's request and entered a stay of the Olde Monmouth Litigation which it has periodically extended to the present date.

*Claims of the Non-Trustee Settling Parties*

33.    The Non-Trustee Settling Parties assert claims against ScripsAmerica and the Estate in connection with ScripsAmerica's malicious prosecution of actions with no basis, including the Securities Action, and its violations of multiple orders in the

---

[3]    Olde Monmouth has filed a proof of claim in the instant case based on its March 3, 2015 indemnification agreement with ScripsAmerica.

California Collection Action.   On January 13, 2016, the California Superior Court awarded attorneys' fees and costs to Global IV in the amount of $213,812.27; and on January 12, 2016, the United States District Court awarded attorneys' fees for the defendants in the Frivolous Securities Action in the amount of $269,260.

34.    After dismissal of the Securities Action, the Non-Trustee Settling Parties commenced an action in the Central District of California captioned <u>Ironridge Global IV, Ltd. et al. v. ScripsAmerica, Inc., et al.</u>, Case No. 2:16-CV- 05335 (C.D. Cal.) (the "**Malicious Prosecution Lawsuit**") against ScripsAmerica and its counsel in the Securities Action to recover damages incurred in connection with the Securities Action, including for attorney's fees and costs and for injury to reputation and resulting lost profits.  This action remains pending in the Central District of California.

35.    Ironridge has filed a proof of claim in this case evidencing its claims and Global IV and Messrs. Kirkland and O'Neil have asserted similar claims.  In addition, the Non-Trustee Settling Parties submit that some or all of the damages they have suffered may be covered by various general liability insurance policies issued to ScripsAmerica for the relevant time periods.

<u>**RELIEF REQUESTED**</u>

36.    By this Settlement Motion the Trustee seeks approval of the Settlement as set forth in the Settlement Agreement pursuant to Bankruptcy Rule 9019(a) and 11 U.S.C. § 105(a).  The Settlement if approved will (i) pursuant to an even split of the LNK Funds, provide approximately $80,000 to the Estate, (ii) result in discontinuance of all pending litigation matters involving the Trustee, the Debtor and the Non-Trustee Settling Parties (and dismissal with prejudice of such actions to the extent no non-Estate or

Debtor parties also are involved),[4] (iii) provide for mutual general releases of all claims and causes of action by the Estate in favor of Non-Trustee Settling Parties and by the Non-Trustee Settling Parties in favor of the Estate, (iv) the expungement of the claim of Global Partners, LLC, and (v) grant relief from stay, to the extent necessary in light of the resolution of claims as set forth herein and the mutual general releases being granted by the Parties, for the Non-Trustee Settling Parties to continue the Non-Bankruptcy Litigation against all parties other than the Estate.

### BASIS FOR RELIEF REQUESTED

37.     The Trustee has made reasonable investigation into the claims and causes of action which the Debtor has asserted against the Non-Trustee Settling Parties  and has determined, consistent with the various rulings of the non-bankruptcy courts as noted above, and for purposes of the Settlement, that they do not have substantial merit and upon which the Estate would be unlikely to prevail.

38.     The Debtor repeatedly has asserted two fundamental arguments against Ironridge, which formed the basis for its claims in all of the Litigation Matters:  first, that the Stipulated Judgment entered in litigation in the California Collection Action was

---

[4]     The actions that either will be dismissed or discontinued as against the Estate include:

*ScripsAmerica, Inc. v. Ironridge Global IV, Ltd., LNK International, Inc. a/k/a L.N.K. International, Inc. and Suffolk County Comptroller*, Adv. No. 18 -51960 (LSS) (Bankr. D. Del.);

*ScripsAmerica, Inc. v. Ironridge Global IV, Ltd., et al.,* Case No. 2:14-cv-03962 (C.D. Cal.);

*ScripsAmerica, Inc. v. Ironridge Global IV, Ltd. et al.,* Case No. 2:17-cv-00945 (C.D. Cal.);

*Charles A. Stanziale, Jr., Chapter 7 Trustee of ScripsAmerica, Inc. v. Ironridge Global IV, Ltd., LNK International, Inc. and Suffolk County Comptroller*, Adv. No. 18-50724 (LSS) (Bankr. D. Del.);

*Ironridge Global IV, Ltd., et al., v. Scrips America, Inc., et al.,* Case No. 2:16-CV-05335 (C.D.Cal.); and

*Ironridge Global IV, Ltd. v. Olde Monmouth Stock Transfer Co., Inc.*, Docket No. L-772-15 (N.J. Super. Ct.) (while the Debtor will be withdrawn as intervenor-defendant, the action will continue as to non-debtor defendant Olde Monmouth).

- 12 -

unfair, fraudulent or inadequately disclosed, because of the provision in the Stipulated Judgment allowing Global IV to receive additional shares as the market price of the Debtor's stock declined as Global IV sold shares; and second, that Global IV was required to register as a securities dealer, assertedly because it obtained unregistered stock at a discount and resold large volumes of shares into the open market. The Trustee addresses these contentions below

a)  The Trustee Does Not Believe He Can Establish that Ironridge Engaged in Securities Fraud

39.    Debtor claimed in the Litigation Matters that Ironridge or its principals made false statements of material fact, or failed to disclose material facts, concerning purported financing agreements involving Ironridge. *See* 15 U.S.C. § 77q(a), 15 U.S.C. § 78j(b), 17 CFR § 240.10b-5.

40.    Debtor's claims in the securities-related litigation it commenced against Global IV in the U.S. District Court for the Central District of California (the "**Central District of California**"), arose "from an allegedly fraudulent scheme to manipulate Scrips' stock price in order to obtain additional shares of the stock under an agreement between the parties pursuant to which Ironridge would pay off certain of Scrips' accounts payable in exchange for issuance of stock set by an agreed upon formula." *See ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 56 F.Supp.3d 1121, 30-31 (C.D. Cal. 2014); *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F.Supp.3d 1213, 1234–35 (C.D. Cal. 2015).

41.    However, in two published decisions, the Central District of California held that the Debtor did not establish and that Ironridge did not commit securities fraud. *Id.* The facts as understood by the Trustee based on his investigation and due diligence

are in accord with the decisions of the Central District of California.

42.     For example, on November 19, 2013, the Debtor filed with the SEC a Current Report on Form 8-K (the "**Scrips 8-K**") describing the material terms of the Stipulated Judgment.  The public report also referenced the California Collection Action. Any member of the investing public could have accessed a copy of the Stipulated Judgment online.

43.     As determined by the Central District of California, Ironridge's conduct in connection with the Stipulated Judgment could not be deceptive or manipulative, because all of the terms were set forth in the written agreement between the parties and filed with the California state court.  *See ScripsAmerica*, 119 F.Supp.3d at 1243 ("the manner in which the adjustment mechanism was to operate was fully disclosed in the parties' agreement and stipulation, which included a merger clause that cut off any right to rely on prior oral representations"); *Camber Energy, Inc. v. Discover Growth Fund*, No. CV H-17-1436, 2017 WL 1969682, at *1 (S.D. Tex. May 11, 2017) (fact that issuer "failed to adequately scrutinize its agreements … before signing them" precluded securities fraud claim against investor).

44.     The Scrips 8-K disclosed the only two terms that mattered:  that the "shares issued to Ironridge are freely tradable" and that the "number of shares issued to Ironridge is subject to adjustment based on the trading price of the Registrant's stock."  In such a circumstance it is reasonably understood that "the stock price will almost certainly drop, because the supply of shares available for purchase in the market increases." *Crown Bridge Partners, LLC v. Sunstock, Inc.*, No. 18 CIV. 7632 (CM), 2019 WL 2498370, at *1 (S.D.N.Y. June 3, 2019), citing Death Spiral Debt,

https://www.investopedia.com/terms/d/deathspiral.asp.  See also *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 106 (2d Cir. 2007) (floorless convertible security is not inherently manipulative, even when coupled with selling).

45.     If the key terms of an agreement are disclosed, *i.e.* that additional shares may be owed if the price drops, an investor cannot commit securities fraud by failing to disclose either the number of shares it has sold or the potential impact of selling activity that is not prohibited under the terms of the deal.  *See ATSI Commc'ns, Inc.*, 493 F.3d at 106.

46.     Regardless, Ironridge has asserted that it was the Debtor, not Ironridge that had an obligation to disclose the material terms of the transaction.  *See S.E.C. v. Chester Holdings, Ltd*., 41 F.Supp.2d 505, 526 (D.N.J.1999).  A third party, such as Ironridge that entered into a contract described in a public report, is not liable for any material misrepresentations or omissions by the filer of the report.  *See S.E.C. v. Dauplaise*, No. 6:05CV1391 ORL 31KRS, 2006 WL 449175, at *7 (M.D. Fla. Feb. 22, 2006).

47.     Continued "high volume" selling of a large number or high percentage of shares through standard brokerage accounts is not unlawful, even if such activity causes the price of the stock to decline substantially resulting in more shares being issued and sold.  *See Sedona Corp. v. Ladenburg Thalmann & Co*., No. 03 CIV 3120 LTS THK, 2009 WL 1492196, at *5 (S.D.N.Y. May 27, 2009); *ATSI Commc'ns*, 493 F.3d at 101; *ScripsAmerica,* 119 F.Supp.3d at 1239-40.  An investor cannot be liable for securities fraud unless specific facts or shown that prove *scienter*, *i.e.* that it wrongfully intended to fraudulently manipulate the market for its benefit.  *Id*.  The Trustee does not believe he

would prevail on this claim as that is not possible when, as here, there was a contractual formula in place that protected the investor from market fluctuations. *Id*.

48. Ironridge has asserted that it sold its shares of the Debtor in a manner designed to maximize its total economic return on investment, by selling as many shares as possible, at the highest price possible, in a manner that had the least negative impact reasonably possible, including directing trades to alternative trading systems that allow institutional investors to trade without exposure until after the trade has been executed and reported to avoid disclosing their selling strategies to the market and pushing the price down, and adjusting the number and percentage of shares sold based on daily supply and demand; none of which misleads investors or constitutes market manipulation. *ATSI Commc'ns*, 493 F.3d at 100-01; *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 207 (3d Cir.2001).

49. The Trustee does not have evidence to establish and does not believe he could prevail at a trial where he would have to prove that Ironridge employed any device, scheme, or artifice to defraud; made any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or engaged in any act, practice, or course of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.  See 17 C.F.R. § 240.10b–5.  Accordingly, the Trustee does not believe he can demonstrate that Ironridge committed securities fraud.  *See ScripsAmerica*, 56 F. Supp. 3d at 1166; *ScripsAmerica, Inc.*, 119 F. Supp. 3d at 1266.

50. The Securities Exchange Act of 1934 provides that, in general, the term

- 16 -

"dealer" means a person "engaged in the business of buying and selling securities" for his own account.  *See* 15 U.S.C. § 78c(a)(5)(A).  The "purpose of the 'engaged in the business' language is to distinguish dealers from traders."  *See Louis Dreyfus Corp*. (SEC No-Action Letter), Fed. Sec. L. Rep. P 78,526, 1987 WL 108160 *2 (July 23, 1987).

51.    A dealer in securities "is an individual or firm who stands ready and willing to buy a security for its own account (at its bid price) or sell from its own account (at its ask price)."    Dealer    Definition    (Investopedia), https://www.investopedia.com/terms/d/dealer.asp.

52.    To be "engaged in the business of buying and selling" a person must continuously hold itself out as willing to buy a specific security, *e.g.* a share of a named public company's stock, at a particular price, and also willing to sell that exact same security at a stated higher price.  *Id.,* Div. of Trading & Markets, U.S. SEC, Guide to Broker-Dealer    Registration    (April    2008), http://www.sec.gov/divisions/marketreg/bdguide.htm.  *See also United Sav. Assoc. of Texas* (SEC No-Action Letter), 1987 WL 107923 at *1 (Apr. 2, 1987).

53.    Ironridge did not buy Debtor's stock in the open market.  Instead the facts reveal that Ironridge acquired it at a discounted price directly from the Debtor.   In addition, Ironridge has informed the Trustee that it did not continuously hold itself out as willing to sell its stock at a stated price, but instead sold anonymously through a regular brokerage account over a period time.  For such reasons, Ironridge was not a dealer.  *Id*.

54.    A "dealer" does not include a person who buys or sells securities for its own account, "but not as a part of a regular business."  *See* 15 U.S.C. § 78c(a)(5)(B). The term "regular business" as used in Section 5(B) means "the regular business of

providing dealer services to others …, such as soliciting investor clients, handling investor clients' money and securities, [and] rendering investment advice to investors." *See Chapel Investments, Inc. v. Cherubim Interests, Inc*., 177 F. Supp. 3d 981, 990 (N.D. Tex. 2016).  These services "distinguish the activities of a dealer from those of a private investor or trader."  *In the Matter of Sodorff*, 50 S.E.C. 1249, 1992 WL 224082 at *5 n.27 (Sept. 2, 1992).  Ironridge has stated that it did not solicit investor clients, handle investor clients' money or securities, or render investment advice to individual members of the investing public, and therefore was not a dealer.  *Id*.

55.    Under the plain language of Section 5(A), "only a person engaged in the business of dealing may be considered a dealer."  *Id*.  Traders and investors like Ironridge who "buy and sell securities" are "not conducting a trade or business" and therefore cannot be dealers under the plain language of the statute.  *See* Topic No. 429 Traders in Securities, https://www.irs.gov/taxtopics/tc429;  Louis Loss & Joel Seligman, Fundamentals of Securities Regulation, Ch. 8A(b) The Dealer-Trader Distinction, pp. 814-15 (2004).

56.    "Dealers are distinguished from investors and traders because they have customers and derive their income from marketing securities for sale to customers or from being compensated for services provided as an intermediary or market-maker."  *Id*. Dealers "effect securities transactions for customers, for which they typically charge a commission or other transaction-based fee."  *XY Plan. Network, LLC v. United States Sec. & Exch. Comm'n*, 963 F.3d 244, 248 (2d Cir. 2020).  Whereas an investor or trader may buy securities from issuers at substantial discounts and resell them into the public market for immediate profit, a dealer buys and sells securities from its customer and to its

customer.  *See* C.H. Meyer, *Law of Stock Brokers and Stock Exchanges § 43-a, at 33-34 (Supp. 1933).*[5]  Institutional investors like Ironridge have no individual customers, and therefore cannot be dealers.  *Id.*

57.    The plain language of Section 5(B) makes clear that a person whose entire business consists of buying and selling securities cannot be a dealer, because such activities must be engaged in as "as part of" a regular business to fall within the definition.  *See* 15 U.S.C. § 78c(a)(5)(B); *In the Matter of Sodorff*, 1992 WL 224082 at *5.  If it were possible for an entity whose only activities are buying and selling securities to be a dealer, the statute would have said "all or part of" rather than "part of."  *Cf., e.g.*, 11 U.S. Code § 1322(b)(8) ("all or part of" claim), 18 U.S.C. § 1955(a) ("all or part of" gambling business), 42 U.S.C. § 6506a(j)(1) ("all or part of" oil or gas pool).  *See also Davenport Mgmt., Inc.* (SEC No-Action Letter), Fed. Sec. L. Rep. P 76,643, 1993 WL 120436 (Apr. 13, 1993), citing Louis Loss, Securities Regulation 2983 (1990). Ironridge's only activities were buying securities from issuers at a discount, and then reselling them into the market for a profit, so under the plain language of Section 5(B) it is not a dealer.

58.    Both investors and dealers seek to profit by buying stock for less than they sell it.  However, investors and traders buy in the open market or directly from issuers, often at a significant discount, and then resell in the open market for a profit, whereas dealers buy from and sell to their customers.  *See* C.H. Meyer, *Law of Stock Brokers and*

---

[5]    The primary purpose of the registration requirement is the protection of the broker or dealer's clients.  *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994).  *See also S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015) (consulting and public relations service providers who depended on acquiring client stock and selling that client stock to fund operations and earn a profit were appropriately found to have acted as dealers); David A. Lipton, A Primer on Broker-Dealer Registration, 36 Cath. U. L. Rev. 899, 907 (1987); 23 Jerry W. Markham & Thomas Lee Hazen, Broker-Dealer Operations Sec. & Comm. Law § 3:1 (2016).

*Stock Exchanges § 43-a, at 33-34 (Supp. 1933)*; *Ackerberg v. Johnson*, 892 F.2d 1328, 1335 (8th Cir. 1989) (person who bought shares from corporate insiders and resold in public markets for his own account "clearly" not a dealer).  Investors and dealers may both purchase large blocks of stock at a discount, and the fact that Ironridge sold hundreds of millions of common shares and a large percentage of volume is irrelevant in determining whether it is a dealer or a trader.  *See Ackerberg*, 892 F.2d at 1335 (distribution is not defined "in quantitative terms").

59.     A "person who buys and sells securities for his own account" as Ironridge did is generally not considered to be "'engaged in the business' of buying and selling securities and consequently, is not deemed to be a 'dealer' under the Act."  *See* Nat'l Council of Sav. Insts., SEC No-Action Letter, 1986 WL 67129 *2 (July 27, 1986).  An entity like Ironridge that regularly purchases and sells securities for its own account, "would not, in the absence of any other securities activities, be deemed a 'dealer' for registration purposes under the Act."  *See Burton Securities*, SEC No-Action Letter, 1977 WL 10680, *2 (Dec. 5, 1977).

60.     Although it was owned and controlled by U.S. residents, Ironridge is a British Virgin Islands company.  *See NewLead Holdings Ltd. v. Ironridge Glob. IV Ltd.*, No. 14CV3945, 2014 WL 2619588, at *3 (S.D.N.Y. June 11, 2014).  Ironridge therefore has taken the position that it "is exempt from registration as a foreign broker-dealer" since it only sold shares through "brokerage accounts at registered broker-dealers." *Oceana Capital Group Limited v. Red Giant Entertainment, Inc*., 150 F.Supp.3d 1219, 1226 (D. Nev. 2015), citing 17 C.F.R. § 240.15a–6(a)(4)(i).  The "resale of shares through registered-broker dealers cannot be considered in determining whether" it is

required to register as a dealer.   *Chapel Investments*, 177 F.Supp.3d at 991.   Since Ironridge only sold common shares through standard brokerage accounts, it is exempt from registration as a foreign broker-dealer.

61.   Lastly, market selling of "freely tradeable shares acquired in a court approved Section 3(a)(10) exchange does not make the person receiving the shares a dealer." *Oceana Capital Group*, 150 F.Supp.3d 1225.

## SETTLEMENT STANDARDS

62.   Bankruptcy Rule 9019(a) provides, in relevant part, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."   Fed. R. Bankr. P. 9019(a).   "[T]he authority to approve a compromise settlement is within the sound discretion of the bankruptcy court."   *See e.g., In re Key3Media Group, Inc.*, 336 B.R. 87, 92 (Bankr. D. Del. 2005).   The standard for approval of a proposed compromise is well established – a court should approve a compromise where it "is fair, reasonable, and in the interest of the estate."   *In re Marvel Entm't Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)); *see Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3d Cir. 1996).

63.   When considering the best interest of the estate, a court must "balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal."   *In re Martin*, 91 F.3d at 393.   In striking this balance, the court should consider: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest

of creditors.  *Id.*

64.    A court does not have to be convinced that the settlement is the best possible compromise; rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities.  *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006).  A court will normally accept the judgment of the movant as long as a legitimate business justification exists.  *Martin*, 91 F.3d at 395.

65.    Applying the foregoing standards to the present case, the Chapter 7 Trustee has concluded, in the proper exercise of his business judgment, that the Settlement is fair, reasonable, and in the best interest of the Estate, and all creditors of, interested parties, and interest holders of, the Estate.

(1)    Probability of Success

66.    In paragraphs 40-62 *supra.* the Trustee has laid out the law as he understands it relating to the securities law-related claims that the Debtor has pressed prior to and after commencement of this bankruptcy case.  Based on the facts and circumstances as the Trustee understands them based on his investigation, the Trustee is not convinced that any of such claims have merit and believes his probability of success in litigation on these claims is unlikely.  The Trustee's view in this regard is buttressed by the above-cited decisions of federal courts that have made rulings that the Debtor's claims have no merit.

67.    Thus, the Trustee believes that if litigated the Estate would not have a good probability of success on the merits of such claims.  Based thereon the Trustee believes that ending the litigation, expunging the Ironridge Global Partners, LLC claim, shielding the estate from potential indemnity exposure and obtaining a portion of the

LNK Funds for the Estate is a very good result for the Estate.

(2)   Likely Difficulties in Collection.

68.   The Trustee submits that the second *Martin* factor is inapplicable here. Given that the Trustee has concluded that aside from the issues with respect to the LNK Funds the Estate has no reasonable expectation of prevailing on any claims against the Non-Trustee Settling Parties, and that the money being divided pursuant to the Settlement already is on deposit with the state court clerk, there are no difficulties in collection.

3)   Complexity of the Litigation Involved, and the Expense, Inconvenience and Delay Necessarily Attending it.

69.   With respect to the third *Martin* factor, substantial expense, inconvenience and delay will be avoided by approving the settlement.   The Settlement Agreement resolves all of the substantial pending litigation between Ironridge and the Debtor in multiple venues and stages.

70.   The disputes represented by the Litigation Matters have been, and would continue to be of a complex nature, the results may be uncertain, and the related time and expense that likely will be needed for resolution of such matters strongly favors approval of the Settlement.

71.   The diversion of additional valuable time and resources to pursue and defend the various actions -- which, as set forth above, have low and uncertain probabilities of success for the Debtor -- will unnecessarily deplete the Debtor's Estate without any reasonable prospect for a greater return to the Estate.

72.   The Settlement avoids further protracted and expensive costs of litigation, and the incurrence of additional costs that would unnecessarily extend the duration of this

chapter 7 case.

    4)    <u>Paramount Interest of the Creditors</u>.

73.    The fourth Martin factor recognizes that every constituency affected by a proposed settlement agreement may not be a signatory to the agreement or involved in the negotiations, and so requires that the court conduct an independent review of the fairness of the proposed settlement agreement. *In re Capmark Fin. Grp. Inc*., 438 B.R. 471, 519-20 (Bankr. D. Del. 2010). While the Court must give the views of objecting parties-in-interest some deference, these views are not dispositive and "cannot be permitted to predominate over the best interests of the estate as a whole." *In re Key3Media Grp., Inc*., 336 B.R. 87, 97 (Bankr.D.Del.2005); *Capmark*, 438 B.R. at 519 ("views of a committee or other creditors" are not "dispositive on the reasonableness of a settlement"); *In re Sea Containers, Ltd*., No. 06–11156(KJC), 2008 WL 4296562, at *11 (Bankr.D.Del. Sept.19, 2008) (approving settlement over objection where creditors failed to convince court "the settlement so affects their position as to be unfair.").

74.    Creditor interests are furthered by the Settlement. The decision to enter into the Settlement was driven, in significant part, by the avoidance of litigation costs and the ability to resolve all issues related to alleged claims involving the Settlement Parties and to shield the estate from additional liability.

75.    Further, the claims and litigation matters that are being resolved by the Settlement involve numerous factual and legal issues that would be time consuming and costly for both sides to litigate. Such litigation likely would have included one or more rounds of written discovery, depositions, possible expert testimony, briefing, and multiple hearings. The cost and delay inherent in such litigation would have negatively impacted

the Chapter 7 Trustee in his efforts at winding up the affairs of the Estate, for the ultimate benefit of creditors, both from a time and cost perspective.

## THE SETTLEMENT MEETS ALL OTHER REQUIREMENTS FOR APPROVAL AS IT IS REASONABLE, THE RESULT OF GOOD-FAITH, ARMS-LENGTH NEGOTIATIONS AND SOUGHT ON PROPER NOTICE

76.     As set forth above, the Trustee has satisfied all elements of the *Martin* test by demonstrating the tangible and intangible benefits provided by the Settlement, which both avoids incurring additional costs and brings badly needed funds into the Estate.

77.     Courts also may consider additional factors, including:  the competency and experience of counsel who support the settlement; the nature and breadth of releases to be obtained by the parties to the settlement; and the extent to which settlement is the product of arm's length bargaining.  *See In re Spielfogel*, 211 B.R. 133, 144 (Bankr. S.D.N.Y. 1997); *In re Dow Corning Corp.*, 198 B.R. 214, 223 (Bankr. E.D. Mich. 1996).

78.     Any of such factors also are in favor of approval of the Settlement.

79.     The Settlement is the result of substantial, good faith, arms-length negotiations between the Chapter 7 Trustee and the Non-Trustee Settling Parties.  The resolutions reflected by the Settlement reflect a result that is favorable to the Estate and constitute a reasonable exercise of the Chapter 7 Trustee's business judgment.

80.     Accordingly, for the foregoing reasons, the Chapter 7 Trustee respectfully submits that all factors that can and should be considered in connection with approval of the Settlement are satisfied and the Court should enter an order approving the Settlement.

## THE SETTLEMENT TERMS ARE CONSISTENT WITH SECTION 3(A)(10) OF THE SECURITIES ACT

81.     The Stipulated Judgment entered in the California Collection Action, pursuant to which ScripsAmerica issued stock to Global IV in satisfaction of its

- 25 -

obligation due and owing to Global IV, was done pursuant to, and in accordance with the requirements of, § 3(a)(10) of the Securities Act, 15 U.S.C. § 77c(a)(10).

82.      Section 3(a)(10) provides an exemption from registration requirements when certain conditions are met.  It provides:

> Except with respect to a security exchanged in a case under title 11, any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court, or by any official or agency of the United States, or by any State or Territorial banking or insurance commission or other governmental authority expressly authorized by law to grant such approval;

15 U.S.C. § 77c(a)(10).

83.      Included among the obligations owed by ScripsAmerica to Global IV were the funds advanced by Global IV to pay the purchase order issued by ScripsAmerica to LNK.  Thus, the LNK Funds are related to the resolution of the cause of action asserted by Global IV against ScripsAmerica in the California Collection Action, which was resolved by ScripsAmerica's agreement to issue stock to Global IV (and to continue to do so until such obligations were satisfied in full).

84.      Thus, the LNK Funds arguably are subject to the § 3(a)(10) exemption and resolution of the competing claims to such funds also are subject to such exemption.

85.      In entering into the Settlement, the Non-Trustee Settling Parties and the Trustee expressly agreed to proceed in accordance with the requirements of, and to rely on the exemption included in, § 3(a)(10) of the Securities Act.

86.      The Parties submit that the requirements of § 3(a)(10) are entirely consistent, and not in any way contrary to, the nature of the notice and the proceeding in

which approval of settlements are sought as required by the Bankruptcy Code and the Bankruptcy Rules and in which approval of the Settlement is being sought.

87.    The requirements of § 3(a)(10) include that:

(a)    the Court must find that the terms and conditions of the Settlement are "fair to those to whom securities will be issued";

(b)    the Court must be advised that the parties intend to rely upon section 3(a)(10) as an exemption from registration;

(c)    the Court must hold a fairness hearing before approving the terms and conditions of the settlement;

(d)    the fairness hearing must be open to everyone to whom securities would be issued if the proposed settlement is accepted;

(e)    adequate notice must be provided to all interested parties; and

(f)    there cannot be "any improper impediments" to the appearance at the fairness hearing by any party that should be present.

88.    The Trustee (as well as the Non-Trustee Settling Parties) submit that all of the foregoing requirements will be met in connection with the Court's consideration of this Motion; thus, the requirements of § 3(a)(10), to the extent applicable, can and will be satisfied.

## <u>RELIEF FROM STAY IS APPROPRIATE</u>

89.    Pursuant to the Settlement, and as set forth in the Settlement Agreement, the Non-Trustee Settling Parties are retaining their claims against the non-Estate defendants in the Securities Action (<u>Ironridge Global IV, Ltd., et al., v. Scrips America, Inc., et al.</u>, Case No. 2:16-CV-05335 (C.D.Cal.)) and the Olde Monmouth Litigation (<u>Ironridge Global IV, Ltd. v. Olde Monmouth Stock Transfer Co., Inc.</u>, Docket No. L-772-15 (N.J. Super. Ct.)).  Pursuant to the discontinuance of such actions with respect to

the Estate and the mutual general releases provided under the Settlement, the Estate will not have any liability to any of the Non-Trustee Settling Parties in connection with these matters. To the extent necessary, relief from the stay is appropriate to allow such matters to proceed against the non-Estate defendants in accordance with the terms of the Settlement Agreement.

**WHEREFORE**, the Trustee respectfully requests that the Court enter the Settlement Approval Order and approve the Settlement and the Settlement Agreement; grant relief from the automatic stay as requested herein; and grant such other and further relief as is just and proper under the circumstances.

Dated:  November 9, 2021
   Wilmington, DE

**MCCARTER & ENGLISH, LLP**

*/s/ Shannon D. Humiston*
Kate R. Buck (No. 5140)
Shannon D. Humiston (No. 5740)
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, DE I 9801
Telephone: (302) 984-6300
Facsimile (302) 984-6399
kbuck@mccarter.com
shumiston@mccarter.com

*- and -*

38165667v.1 128239/00013

Jeffrey T. Testa, Esq.
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Telephone: (973) 622-4444
jtesta@mccarter.com

*Counsel for the Chapter 7 Trustee/Plaintiff*